# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

MINERVA LACHIRA,                    :
    Plaintiff,                  :
                             :
v.                                  :        Case No. 3:05cv1585 (PCD)
                             :
JAMES SUTTON and STANFORD           :
SUTTON,                             :
    Defendants.                 :

## RULING ON MOTION TO STRIKE & MOTION FOR SUMMARY JUDGMENT

Plaintiff's claims are brought pursuant to the federal Fair Housing Act of 1968, 42 U.S.C. § 3601, et seq. ("FHA"), alleging that Defendants discriminated against her based on her race, ethnic origin, disability and familial status. Plaintiff also asserts a state law claim of intentional infliction of emotional distress. Defendants move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment on Plaintiff's Amended Complaint, arguing that they are entitled to judgment as a matter of law on all claims set forth in Plaintiff's Amended Complaint and asserting that there are no genuine material issues of fact remaining for trial. Plaintiff filed an opposition to Defendant's motion, and Defendant subsequently moved to strike Plaintiff's affidavit and the exhibits attached thereto. Plaintiff did not file an opposition to Defendant's Motion to Strike. For the reasons set forth herein, Defendants' Motion for Summary Judgment [Doc. No. 32] is **granted** and their Motion to Strike [Doc. No. 48] is **granted in part** and **denied in part**.

## I.     MOTION TO STRIKE

Defendants move, pursuant to Federal Rule of Civil Procedure 56(e) and Local Rule 56, to strike materials submitted by Plaintiff in support of her Memorandum in Opposition to

Defendants' Motion for Summary Judgment.  Specifically, Defendants move to strike Plaintiff's

Affidavit and the attached exhibits in their entirety.  Alternatively, Defendants move to strike

specific statements and exhibits referenced in Plaintiff's Affidavit prior to this Court deciding the

pending Motion for Summary Judgment.  Plaintiff has not filed an opposition to Defendants'

motion to strike.[1]

### A.     Plaintiff's Affidavit & Exhibits

#### 1.     Affidavit

Rule 56(e) of the Federal Rules of Civil Procedure provides that "[w]hen a motion for

summary judgment is made . . . an adverse party may not rest upon the mere allegations or

denials of the adverse party's pleading, but the adverse party's response, by affidavits or as

otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue

for trial." FED. R. CIV. P. 56(e). When a nonmovant relies on affidavits to oppose a motion for

summary judgment, those affidavits must meet the requirements set forth in Rule 56(e):

> Supporting and opposing affidavits shall be made on personal knowledge, shall set
> forth such facts as would be admissible in evidence, and shall show affirmatively that
> the affiant is competent to testify to the matters stated therein.

Id.  The personal knowledge requirement is mandatory. United States v. Bosurgi, 530 F.2d 1105,

1112 (2d Cir. 1976).  A court may "strike portions of an affidavit that are not based upon the

affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory

statements." Hollander v. American Cyanamid Co., 172 F.3d 192, 198 (2d Cir.), cert. denied, 528

U.S. 965, 120 S. Ct. 399, 145 L. Ed. 2d 311 (1999).  Moreover, "a party may not create an issue

---

[1]     It is noted, in light of Plaintiff's failure to respond to Defendants' Motion to Strike, that the
"failure to submit a memorandum in opposition to [the] motion may be deemed sufficient cause to
grant the motion." D. Conn. L. Civ. R. 7(a).

of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997) (quoting Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996)); see also Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."). Finally, conclusory allegations, examination of thoughts, opinions, argument and legal conclusions are all prohibited from affidavits submitted in support of, or opposition to, a summary judgment motion under Rule 56(e). See Paul T. Freund Corp. v. Commonwealth Packing Co., 288 F. Supp. 2d 357, 369 (W.D.N.Y. 2003).

The court will hereby strike the following portions of the Lachira Affidavit because they contain inadmissible hearsay, generalized conclusory and argumentative statements, legal conclusions, information which could not be attributed to plaintiff's personal knowledge, and/or because they contradict, either by addition or omission, Plaintiff's previous deposition testimony and/or CHRO (Connecticut Commission on Human Rights and Opportunities) complaint affidavit: the statements in paragraph 5 that "there have never been tenants with children in the defendants' building" and that "[t]he defendants never wanted my child in their home"; paragraph 6; the statements in paragraph 7 that "the defendants continually abused me," that "the defendants came to my home with a screw driver to remove the lock from the front door" and the phrase "take your child away from here"; paragraph 8; the phrase in paragraph 9 "to punish me"; paragraph 11; paragraphs 16-21; the portion of paragraph 22 purporting to testify as to why

Defendants decided to install the second railing in the stairwell of 1068 North Street; the statement in paragraph 28 that "[t]he defendants had a scheme to move me to another building om [sic] plaintiffs home"; and paragraphs 29-30.

2.    Exhibits

Defendants first argue that Plaintiff's "blanket authentication" of the exhibits in paragraph 3 of her affidavit is improper and ask the Court to strike all of Plaintiff's exhibits from the record. They contend that Plaintiff failed to provide sufficient foundation for admission of the exhibits at trial, thereby violating Federal Rule of Civil Procedure 56(e).

The proper methods of authentication are not directly addressed in Rule 56(e), however, Federal Rule of Evidence 901(a) provides that the authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Therefore, to authenticate a document, a witness with personal knowledge to that effect need only testify "that the document is what it purports to be." In re WorldCom, Inc., 357 B.R. 223, 228 (S.D.N.Y. 2006); see also Fed. R. Evid. 901(b)(1) (permitting authentication by testimony of a witness with knowledge"that a matter is what it is claimed to be"); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2722 (3d ed. 2005) ("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence."). The witness need not have "personal knowledge of the underlying events described in the document, the substance or accuracy of the document, [or] the methods of calculation." In re WorldCom, Inc., 357 B.R. at 228.

With regard to the evidence that must be produced in order to authenticate a document, "[t]his threshold determination is relatively low, as evidence is admissible as authentic 'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'" Bazak Int'l Corp. v. Tarrant Apparel Group, 378 F. Supp. 2d 377, 391-92 (S.D.N.Y. 2005) (quoting United States v. Ruggiero, 928 F.2d 1289, 1303 (2d Cir. 1991)); see also United States v. Pluta, 176 F.3d 43, 49 (2d Cir. 1999) ("The burden of authentication does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be. Rather, the standard for authentication, and hence for admissibility, is one of reasonable likelihood.") (citation omitted). Once this Court determines that Plaintiff has produced evidence sufficient to show by a "reasonable likelihood" that the documents "in question [are] what its proponent claims," then "the evidence may be admitted and any outstanding issues regarding its authenticity are to be resolved by the fact-finder." Bazak Int'l Corp., 378 F. Supp. 2d at 392 (citing Raskin, 125 F.3d at 66).

In paragraph 3 of her affidavit, Plaintiff states: "Attached to this affidavit are Exhibits a - z. These Exhibits are true and accurate." (Lachira Aff. ¶ 3.) The documents attached as exhibits include numerous letters, a Town of Greenwich Department of Health Inspection Report, the Landlord-Tenant Agreement between the parties, a Greenwich Police Report, Norwalk Superior Court records, among many others. (See Exs. A-Z to Lachira Aff.) With regard to the majority of the exhibits, Defendants do not provide specific arguments as to why Plaintiff's blanket authentication is insufficient or state why she would not be competent to testify that the documents are what they are claimed to be. In addition to challenging the method of

authentication of all of the exhibits, however, Defendants also challenge the authenticity of several specific exhibits, namely, exhibits C, D and E.[2]  Because Defendants do not challenge the actual authenticity of all of the exhibits, as opposed to the method of authentication, only those specifically addressed will be dealt with here.

        *a.*     *Exhibit C*

Exhibit C contains a typewritten, unsigned letter dated April 29, 2000, which purports to summarize a confrontation between Plaintiff and Guy Sutton that Plaintiff claims occurred on April 27, 2000.  Defendants dispute the authenticity of the letter, arguing that there is no foundation that the letter was actually mailed or received by anyone.

Authentication of letters, as with other documents, requires a showing that there is a "reasonable likelihood" that the letter is what its proponent claims.  A letter need not be signed nor proven to be in Plaintiff's handwriting to be authenticated, see United States v. Thompson, 449 F.3d 267, 274 (1st Cir. 2006), however, there must be some indicia of authorship and/or authenticity. See United States v. Bagaric, 706 F.2d 42, 67 (2d Cir. 1983) (authentication may be established entirely with circumstantial evidence, including "'appearance, contents, substance . . . and other distinctive characteristics' of the writing") (quoting Fed. R. Evid. 901(b)(4)).  In Bazak Int'l Corp., the Southern District of New York held that a letter was authenticated and admissible where the alleged letter writer and his assistant both attested the letter was handwritten by the alleged letter writer and subsequently typed on the computer and mailed by his assistant. 378 F. Supp. 2d at 392 (noting that "[w]hether the alleged facts are credible in light of [any] evidence to

---

[2]      Defendants also contend that Exhibit U should be stricken, but offer no argument in support of this assertion.

the contrary is a question for the jury and inappropriate to determine on summary judgment").

Although Plaintiff, as the purported author of the letter, qualifies as a "witness with knowledge," she did not specifically reference the letter in her affidavit. Moreover, she does not state whether the letter was actually mailed and does not include a postmarked envelope or any other relevant evidence. Plaintiff also did not attest to the date on which the letter was written. Although the date typed in the upper left-hand corner of the letter is April 29, 2000, there is no evidence to show that the letter was actually written and/or mailed on or around that date. Finally, as Defendants point out, the contents of the letter contradict Plaintiff's prior deposition testimony and her Local Rule 56(a)2 Statement, in which she attributed insulting statements to James Sutton, rather than Guy Sutton. Because of the numerous questions surrounding the authenticity of the letter, the Court finds that Plaintiff has not met her burden of authenticating the letter and establishing its credibility as required by Federal Rule of Evidence 901(a). Accordingly, Exhibit C will be stricken from the summary judgment record.

     *b.*    *Exhibit D*

Attached as Plaintiff's Exhibit D are copies of Norwalk Superior Court records. Defendants argue that these records are inadmissible because they are incomplete, unauthenticated and contain hearsay. In order to authenticate public records, Plaintiff must produce "[e]vidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record . . . is from the public office where items of this nature are kept." Fed. R. Evid. 901(b)(7). Federal Rule of Evidence 902 provides that certain types of documents are self-authenticating, such that they do not require extrinsic evidence for authentication. See Fed. R. Evid. 902. A domestic public record is self-

authenticating if it is submitted under seal or if it is a certified copy. Fed. R. Evid. 902(1), (4).  If, as here, a public record does not fall into one of these two categories, it must comply with the requirements of Rule 901(b)(7), as set forth above.  Because Plaintiff has presented no evidence that the records contained in Exhibit D are "from the public office where items of this nature are kept," they are not properly authenticated.  As such, Exhibit D will be stricken from the summary judgment record.

    c.  *Exhibit E*

Included in Plaintiff's Exhibit E are copies of various letters purported to be written by Plaintiff to Defendants requesting that repairs be made.  Defendants again argue that these documents are inadmissible because there is no foundation that the letters were mailed to or received by Defendants, and because they are unauthenticated, self-serving hearsay.  The letters were purportedly written over a long period of time, dated September 10, 2003 through April 29, 2006.  As with the letter contained in Exhibit C, these letters are type-written and unsigned. Plaintiff also did not specifically reference these letters in her affidavit and fails to state whether the letters were actually mailed.  Moreover, there is no outward indicia of authenticity, as the exhibit does not, for example include a postmarked envelope or any other relevant evidence indicating that the letters were mailed by Plaintiff or received by Defendants.  For the same reasons as set forth with regard to Exhibit C, the Court finds that Plaintiff has not met her burden of authenticating the letters and establishing their credibility as required by Federal Rule of Evidence 901(a), and therefore strikes the letters from the summary judgment record.

Exhibit E also contains a letter from a physician addressed to the State of Connecticut Disability Determination Services dated February 28, 2003.  Again, Defendants argue that

Plaintiff has failed to provide a sufficient foundation for the authenticity and admissibility of this document at trial. Plaintiff failed to provide an affidavit from the physician attesting to the letter's authenticity or any other evidence of authenticity. Accordingly, this letter will be stricken from the record.

### B. Plaintiff's Local Rule 56(a)2 Statement

A party opposing a motion for summary judgment in the District of Connecticut must file a Local Rule 56(a)2 Statement in response to the material facts set forth in the movant's Local Rule 56(a)1 Statement. Each denial in the opponent's Local Rule 56(a)2 Statement must be followed by a specific citation to: "(1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." D. Conn. L. Civ. R. 56(a)3. Defendants point out that Plaintiff repeatedly fails, in her Local Rule 56(a)2 Statement, to give "specific citations to evidence in the record" as required by Local Rule 56(a)3. See D. Conn. L. Civ. R. 56(a)3. When a party fails to appropriately deny material facts set forth in the movant's Local Rule 56(a)1 statement, those facts are deemed admitted. See Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002) ("Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); SEC v. Global Telecom Servs. L.L.C., 325 F. Supp. 2d 94, 109 (D. Conn. 2004) (same); Root v. Liston, 363 F. Supp. 2d 190, 191 n.1 (D. Conn. 2005); Martin v. Town of Westport, 329 F. Supp. 2d 318, 323 n.1 (D. Conn. 2004). Moreover, as this Court recognized in SEC v. Global Telecom Services L.L.C., the "failure to provide specific citations to the record . . . may result in sanctions, including . . . an order granting the motion" for summary judgment." 325 F. Supp. 2d 94, 108-109 (D. Conn. 2004) (quoting D. Conn. L. Civ. R. 56(a)3).

In paragraphs 7, 8, 14, 21, 25, 26, 27 and 31, Plaintiff denies Defendants' assertions, but does not provide a specific citation to the record.[3] Because these denials fail to meet the requirements of Local Rule 56(a)2, the facts set forth in Defendants' Local Rule 56(a)(1) Statement at paragraphs 7, 8, 14, 21, 25, 26, 27 and 31 are deemed admitted.

## II. MOTION FOR SUMMARY JUDGMENT

### A. Background

Plaintiff is a residential tenant who occupies a one-bedroom apartment, Apartment Number 3-S, in a building located at 1068 North Street in Greenwich, Connecticut. Plaintiff has lived in this apartment with her sixteen-year-old son since 1999. The building located at 1068 North Street is a three-story building with two small stores on the first floor, two apartments on the second floor and two apartments on the third floor. Defendant Stanford Sutton is the owner of and landlord for the building and the apartment in question. Defendant James Sutton, Stanford Sutton's son, is the property manager and leasing agent for the property. Former defendant Guy Sutton, also Stanford Sutton's son, is an attorney who provides legal services to his father.[4] In October 2003, Plaintiff was granted Section 8 housing choice vouchers by the United States Department of Housing and Urban Development ("HUD").[5]

Throughout Plaintiff's tenancy, Defendant Stanford Sutton owned a number of residential

---

[3] Plaintiff either provides no citation at all or cites generally to "plaintiff's affidavit."

[4] Plaintiff dismissed Guy Sutton from this lawsuit with prejudice on September 27, 2006.

[5] The Section 8 Program is designed "for the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a). Participants in the Section 8 program receive vouchers from the local Housing Authority, which they may use to rent a unit on the private housing market. The program provides that the tenant will pay approximately thirty-percent of her income toward the monthly rent, with the Housing Authority paying the remainder of the monthly rent directly to the landlord. See Salute v. Stratford Greens Garden Apartments, 136 F.3d 293, 296 (2d Cir. 1998); see generally 42 U.S.C. § 1437f.

properties in Greenwich. A number of the tenants occupying these properties were persons of Hispanic ancestry.[6] Also during Plaintiff's tenancy, Stanford Sutton leased an apartment to at least one other single Hispanic woman receiving Section 8 assistance.[7]

According to Plaintiff, there are no other tenants with children in Defendants' building at 1068 North Street. (Lachira Aff. ¶ 5.) She contends that Defendants told her that "it has been a mistake to rent to you with a child . . . for . . . two years," and that they had been telling her, since 1999, that they did not want her child in the building (Id. ¶¶ 5, 10.) Plaintiff's affidavit details a contentious relationship between her and Defendants. Notably, she contends that Defendants "screamed cursed and insulted [her,] including saying 'move you stupid Spanish people,'" and screamed and cursed at her child, telling him that he and Plaintiff were "stupid Spanish people" and that there were no children allowed in the building. (Id. ¶¶ 7, 12.) James Sutton denies making these statements. (James Sutton Decl. ¶ 25.) She claims that Defendants have entered her apartment "without notice," and have looked through her child's room and his desk. (Lachira Aff. ¶ 13.) A police report dated April 27, 2000 indicates that the police were dispatched to 1068 North Street on that date for a "landlord tenant disagreement about having son in apartment." (Police Report, Apr. 27, 2000, Pl.'s Ex. C.) Plaintiff claims that Defendants refused to perform repairs in the building, despite her requests to do so, and even after the Health Department and Building Department were contacted. (Lachira Aff. ¶¶ 9, 14.) According to Plaintiff, as her

---

[6] Specifically, Defendants name the following tenants: Omar Romero, Oswald Travasso, Hector Romano, Frank Rivera, Laura Solis, Jose Forlese and Emma Norvat. (See Defs.' Local Rule 56(a)(1) Statement ¶ 3 (citing James Sutton Decl. ¶ 7, Dec. 13, 2006, Defs.'s App. 1; Exs. A &B to James Sutton Decl.).)

[7] Defendants identify this tenant as Ann M. Didio, residing at 415 East Putnam Avenue, Apartment Number 2, Greenwich, Connecticut.

disability worsened, she needed railings installed on the stairway in the building. (Id. ¶ 22.) She requested that Defendants install the railings in 2003 and 2004, with no results. (Id.) Plaintiff admitted in her deposition, however, that Defendants fulfilled her reasonable accommodation request for the installation of a second railing at 1068 North Street in 2005. (Lachira Dep. 117:5-7, Aug. 10, 2006, Defs.' App. 3.)

Plaintiff claims that when she was granted Section 8 assistance in October 2003, Defendants refused to sign the application until they were forced to do so by HUD. (Lachira Aff. ¶ 23.) She claims that Defendants refused to do the necessary repairs for HUD inspections and that she had to paint the bathroom and put caulking in the bath tap while she was ill in order to ensure that the apartment passed an inspection. (Id. ¶¶ 24-25.)

According to Defendants, Plaintiff approached James Sutton in early 2004 and asked if the landlord, Stanford Sutton, would be willing to rent Plaintiff a second one-bedroom apartment on the same floor in addition to her current apartment. She wanted to combine the two apartments, giving her two bedrooms and additional space.[8] James Sutton signed a Request for Tenancy Approval ("RFTA") which was submitted to the Housing Authority of the Town of Greenwich. The RFTA was denied pursuant to HUD guidelines for the Section 8 program, which require that the Total Tenant Obligation for the tenant's portion of the rent and utilities not exceed forty percent of her adjusted gross income and initial lease up. (See Muldoon Decl. ¶¶ 4-

---

[8] Plaintiff claims that combining the two apartments was Defendants' idea and that they told her the rent for the two apartments would be the same amount as she had been paying for one apartment. (Lachira Aff. ¶ 27.) She claims that this was part of their "scheme" to move her to another building. (Id. ¶ 28.)

5, Mar. 2, 2007, Ex. A to Defs.' Reply.[9])  The proposed monthly rental payment in the RFTA for

the combined apartment unit was far in excess of that payment standard. (Id. ¶ 5.)  As a result,

Plaintiff's RFTA was denied. (Id. ¶ 6.)  After learning of the RFTA denial, James Sutton offered

Plaintiff the opportunity to move with her son to a two-bedroom apartment at 418 Putnam

Avenue, which Plaintiff would be able to afford under existing Section 8 guidelines.  Plaintiff

refused the offer.

Subsequently, Plaintiff began badgering James Sutton with unjustified complaints about

the building and called him repeatedly on the phone asking him to lower the rent for the other

one-bedroom apartment at 1068 North Street.  Because of this behavior, Stanford Sutton refused

to renew Plaintiff's one-year lease when it expired in October 2004.  On July 27, 2004, Stanford

Sutton sent Plaintiff a letter confirming that he was electing not to renew Plaintiff's Section 8

lease and that he would be notifying the Housing Authority of the Town of Greenwich of that

decision.

Plaintiff contends that in May 2004, Defendants locked her out of the basement where the

washer and dryer for the building, as well as some of her "personal property," are located.

(Lachira Aff. ¶¶ 31-32.)  She claims that Defendants took some of her property and left it outside

the building. (Id. ¶ 33.)  Plaintiff further contends that she was denied water for twenty-eight

days, and received only five to seven gallons of water during this time. (Id. ¶ 34.)  In an October

28, 2004 Housing Court proceeding between Plaintiff and Defendants, it was revealed that the

---

[9]   Patricia Muldoon is the Section 8 Coordinator for the Housing Authority of the Town of
Greenwich. (Muldoon Decl. ¶ 3.)  She has had direct dealings with both Plaintiff and James Sutton
in connection with Plaintiff's Section 8 tenancy, and was responsible for reviewing Plaintiff's
RFTA.

washer and dryer had been broken, but that Plaintiff had refused to stop using it while Defendants were waiting to have the repairs finished, forcing them to close off the basement. (Housing Court Trans. 6:10-10:16, Oct. 28, 2004, Pl.'s Ex. K.)  The parties agreed at the hearing that Defendants would reopen the basement if Plaintiff would not use the washer and dryer until the repairs had been completed. (Id.)  It was also revealed that Plaintiff was not denied water for twenty-eight days, but that Defendants had asked the tenants not to drink the water because it was being tested for bacteria. (Id. at 11:20-12:11.)  Defendants had supplied Plaintiff with seven gallons of water while the testing was proceeding, and the Housing Court ordered them to supply her with "all the water she needs . . . for drinking." (Id. at 12:25-13:22.)

On September 3, 2004, Plaintiff was served with a notice to quit notifying her that she had to move out when her lease expired in October 2004.  On October 5, 2004, after Plaintiff had failed to vacate the apartment, Defendants filed a summary process action against her in the Norwalk Housing Court.  Attorney Rick Brody, from Connecticut Legal Services, appeared on Plaintiff's behalf on October 15, 2004 and has represented Plaintiff in the summary process proceedings up to the present time.

On December 21, 2004, Plaintiff filed a *pro se* discrimination complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO").  The complaint alleged discrimination based on Plaintiff's ancestry (Hispanic), her national origin (Peruvian), her lawful source of income (Section 8) and included claims of misconduct identical to those claimed here.  Plaintiff contends that on February 9, 2005, Defendants came to her apartment and were angry and demanded to know why she had submitted a complaint to the Greenwich Health Department and Building Department. (Lachira Aff. ¶ 43.)  She claims that Defendants "kicked

[her] plants outside of [her] home," causing her to contact the police. (Id. ¶¶ 44-45.)

On September 15, 2006, the CHRO issued its "Preliminary Draft of the Final Investigative Report," (the "CHRO Report"), which concluded that there was "no credible evidence to support [Plaintiff's] allegations that [Defendants] adversely treated her due to her protected classes." (CHRO Report 13, Sept. 15, 2006, Ex. E to James Sutton Decl.)  With regard to Plaintiff, the CHRO found that she lacked credibility and that there was a "history of [her] being a problematic tenant." (Id. at 13-14.)  Although Plaintiff did not formally raise a disability discrimination claim in her CHRO complaint, the CHRO Report also considered and disposed of any disability discrimination claim, finding that Defendants had installed railings leading to the third floor of the building, thereby complying with Plaintiff's request for reasonable accommodation. (Id. at 13.)  Just before the fifteen-day comment period on the CHRO Report was to expire, Plaintiff withdrew her CHRO complaint in favor of filing a complaint in federal court. (James Sutton Decl. ¶ 15.)

The first eviction trial between the parties ("*Sutton I*") went to trial on July 21, 2005 while the CHRO proceedings were pending. (James Sutton Decl. ¶ 16.)  At trial, Plaintiff asserted various special defenses, including defenses of retaliatory eviction and discrimination, as well as a general defense based on the equitable doctrine against forfeitures. (Id.; Am. Ans. & Special Defense, Ex. F to James Sutton Decl.)  The housing court in *Sutton I* found that the notice to quit served on Plaintiff by Defendants was valid, that Plaintiff's tenancy had expired and that Plaintiff's special defenses lacked merit. (*Sutton I* Trans. 9-10, July 21, 2005, Defs.' App. 4.)  The housing court noted that Plaintiff did not act in good faith and that her testimony was "so exaggerated and so incredulous . . . that [the court] can't give much of her testimony any

credit at all." (Id. at 6, 10.)  The court entered judgment for Plaintiff on equitable grounds, however, finding that if Plaintiff were evicted, she would lose her Section 8 status. (Id. at 10.)

Following the conclusion of *Sutton I*, Defendants reinstated Plaintiff as a month-to-month tenant in accordance with her prior Section 8 lease.  Defendants received additional complaints from tenants in the building with regard to Plaintiff after she was reinstated.  Two tenants, Fiaz Arain and Tertulien Thomas, eventually sent letters to James Sutton in which they memorialized their complaints and threatened to move out if the situation was not addressed. (Arain Letter, Sept. 8, 2005, Ex. G to James Sutton Decl.[10]; Thomas Letter, Nov. 28, 2005, Ex. H to James Sutton Decl.[11])

On October 31, 2005, Defendants provided Plaintiff with sixty-days advance notice that her Section 8 lease would not be renewed beyond the month-to-month tern expiring December 31, 2005, and advised Plaintiff that her misconduct constituted a nuisance as well as material non-compliance with the lease. (Termination Letter, Oct. 31, 2005, Ex. I to James Sutton Decl.) On December 6, 2005, Defendants served Plaintiff with another notice to quit and commenced a second eviction action against her on January 30, 2006 ("*Sutton II*").  Plaintiff contested Defendants' allegations and alleged special defenses based on equity and res judicata.  *Sutton II* went to trial on May 4 and May 11, 2006.

---

[10]     In his letter to James Sutton, Mr. Arain writes that he has "decided to vacate . . . apartment #2S by the end of the month," despite his initial plan to stay there long-term, due to the fact that Plaintiff "ha[d] been constantly bothering [him]." (Arain Letter.)  Mr. Arain goes on to list examples of Plaintiff's conduct which prompted the letter. (See id.)

[11]     In his letter to James Sutton, Mr. Thomas writes that "ever since [he] moved in the tenants upstairs have been extremely annoying." (Thomas Letter.)  He lists examples of their behavior and concludes by saying that he "need[s] [his] peace" and if Plaintiff's behavior continues, he "will have to move out because [he] just can't take it anymore." (Id.)

Plaintiff contends that on December 19, 2005, Defendant James Sutton and Defendants'

handyman, Graham Leavey, came to her apartment to do repairs and as she was closing the door,

James Sutton ran into the apartment, apparently hurting her "hand, arm and body" in the process.

(Lachira Aff. ¶ 38.)  She claims that Defendant took pictures and attempted to enter her bedroom.

The police were called, and the report indicates that Plaintiff's "chief complaint was that [James]

Sutton was not invited into her apartment and that her left arm and chest hurts.  She also felt

violated when [James] Sutton brushed into her," however, she did not want to go to the hospital

when asked by the police. (Police Report, Dec. 19, 2005, Pl.'s Ex. U.)  The police examined

Plaintiff's left arm and found "no sign of redness, swelling, contusions, crepitus or deformity to

any portion of her arm or wrist." (Id.)  Plaintiff told the police that James Sutton had not grabbed

her.  The police talked with James Sutton and Leavey separately, at which point James Sutton

told the police about the incident, which apparently started when Plaintiff asked James Sutton to

take off his shoes before entering the apartment.  James Sutton told the police that when he was

in the apartment, Plaintiff threatened him by saying, "I know you have a wife and an 18 month

old baby, be careful of the consequences." (Id.)  James Sutton stated that he was becoming

"increasingly alarmed at that comment and began to fear for his family's safety." (Id.)  After

finishing their investigation, the police "were unable to substantiate the injury complaints with

physical evidence or observations made by the witness," and noted that "[t]he contact made

between [James] Sutton and [Plaintiff] could not have been avoided in such a confined space."

(Id.)

During trial in *Sutton II*, Defendants presented testimony from two tenants—Mr. Arain

and Mr. Thomas—who gave testimony regarding Plaintiff's behavior which was similar to the

allegations set forth in their letters. (*Sutton II* Trans. 17-50, May 11, 2006, Defs.' App. 5.)

Defendants' handyman, Graham Leavey, testified that during the December 19, 2005 incident,

detailed above, he heard Plaintiff tell James Sutton, "you have a wife and an eighteen month old

daughter and they will have to pay the consequence." (Id. at 52.) Before the trial concluded, the

parties entered into an agreement settling the matter.

Plaintiff continues to occupy Apartment Number 3-S pursuant to the Stipulated

Agreement between Plaintiff and Stanford Sutton entered in *Sutton II*. The Norwalk Housing

Court entered judgment in accordance with the Agreement on May 11, 2006. The Agreement

provides for a judgment of possession in favor of Stanford Sutton, with a final stay of execution

through June 30, 2007. (See Stip. Agr., Ex. K to James Sutton Decl.) Plaintiff was assisted by

counsel in negotiating and entering into the Stipulated Agreement. The housing court judge

canvassed Plaintiff on the Agreement before entering judgment, during which Plaintiff

acknowledged that it was a "fair agreement," and that no one forced her to sign it. (*Sutton II*

Trans. 88:3-19, May 11, 2006, Defs.' App. 5.)

Plaintiff admitted in her deposition that she "didn't know" whether certain allegations in

her Amended Complaint were accurate and truthful, including allegations that (1) James Sutton

asked her to relocate to another building, (Am. Compl. ¶ 16); (2) Plaintiff declined the request to

move because the rooms were too small, (id. ¶ 17); and (3) James Sutton informed Plaintiff that

she and her child would be moved and "put on the streets," (id. ¶ 18). (See Lachira Dep. 174-78.)

Plaintiff also admitted that she does not know whether she sustained any damages or actual harm

as a result of Defendants' alleged misconduct. (See id. at 187:5- 17.)

Plaintiff has filed, *pro se*, three new civil actions in the Connecticut Superior Court

against James Sutton, Sutton Real Estate Services, Stanford Sutton, Guy Sutton, the Sutton's handyman, Graham Leavey, the Town of Greenwich and the Connecticut Department of Public Health. The complaints in the first two cases are dated September 26, 2006 and October 20, 2006. (See Exs. L & M to James Sutton Decl.) After Defendants filed their summary judgment motion with this Court, Plaintiff filed her third *pro se* suit against Defendants in state court ("*Sutton III*"). This new suit also named as defendants Attorney Frederick Brody (Plaintiff's attorney in the housing court proceedings), Statewide Legal Services and Connecticut Legal Services (Attorney Brody's affiliated legal organizations), defense counsel Robert Frost, and the law firm of Zeldes, Needle & Cooper, P.C. (the law firm that represented the Suttons in the housing court proceedings). In that suit, Plaintiff claims, *inter alia*, that Defendants, their lawyer and her lawyer made "calculated misrepresentations" and tricked Plaintiff into signing the May 11, 2006 Stipulated Agreement that mandates her eviction on June 30, 2007. (See Guy Sutton Decl. ¶ 13; *Sutton III* Compl., Ex. D to Guy Sutton Decl.)

**B.    Standard of Review**

Summary judgment is appropriate only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). A material fact is one which "might affect the outcome of the suit under the governing law" and an issue is genuine when "the evidence is such

19

that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Importantly, however,

"[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v.

Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

The moving party bears the burden of establishing that summary judgment is appropriate.

Anderson, 477 U.S. at 255.  When moving for summary judgment against a party who will bear

the ultimate burden of proof at trial, the movant can satisfy its burden of establishing that there is

no genuine issue of material fact in dispute by pointing to an absence of evidence to support an

essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-

23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  "A defendant need not prove a negative when it

moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point

to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific

facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260

F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential

Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("The moving party may

obtain summary judgment by showing that little or no evidence may be found in support of the

nonmoving party's case."  The nonmoving party, in order to defeat summary judgment, must

then come forward with "sufficient evidence favoring the nonmoving party for a jury to return a

verdict for that party." Anderson, 477 U.S. at 249.  In making this determination, the court draws

"all factual inferences in favor of the party against whom summary judgment is sought, viewing

the factual assertions in materials such as affidavits, exhibits, and depositions in the light most

favorable to the party opposing the motion." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d

Cir. 1995) (citations omitted). A party opposing summary judgment, however, "may not rest upon the mere allegations or denials of the adverse party's pleading." FED. R. CIV. P. 56(e).

Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996). "If reasonable minds could differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); see also Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000) ("When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.").

## C. Discussion

Plaintiff alleges that Defendants discriminated against her based on "race, ethnic origin, disability and familial status," citing three statutory provisions: 42 U.S.C. §§ 3604(f)(1), 3617 and 3604(f)(3)(B). (Am. Compl. ¶ 1.) Defendants deny discriminating against Plaintiff due to her national origin, ancestry, source of income, alleged disability or any other prohibited basis in the terms and conditions of her rental or by seeking to evict her. (James Sutton Decl. ¶¶ 9-10; Stanford Sutton Decl. ¶¶ 5-6, Dec. 13, 2006, App. 2.)

### 1. Judicial Estoppel

Defendants first argue that Plaintiff's claims are barred by judicial estoppel. Under the doctrine of judicial estoppel, "[w]here a party assumes a certain position in a legal proceeding,

and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." New Hampshire v. Maine, 532 U.S. 742, 749, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) (quotation marks and citation omitted); see also 18 Moore's Federal Practice § 134.30 (3d ed. 2000) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding");18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4477 (2d ed. 1981) ("Absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.").  The Supreme Court noted that the purpose of judicial estoppel is "to protect the integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." New Hampshire v. Maine, 532 U.S. at 749-50 (citations omitted); see also Bates v. Long Island R.R. Co., 997 F.2d 1028, 1037 (2d Cir.) ("judicial estoppel protects the sanctity of the oath and the integrity of the judicial process"), cert. denied, 510 U.S. 992, 114 S. Ct. 550, 126 L. Ed. 2d 452 (1993); Scarano v. Central R.R. Co., 203 F.2d 510, 512-513 (3d Cir. 1953) (judicial estoppel prevents parties from "playing 'fast and loose with the courts'") (citation omitted).

Although there is no concrete formula for determining when judicial estoppel applies, factors to consider include: (1) whether a party's later position is "clearly inconsistent" with an earlier position; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "whether the

party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." New Hampshire v. Maine, 532 U.S. at 750-51 (internal quotations and citations omitted). The factors set forth by the Supreme Court are not exclusive; additional considerations may inform the doctrine's application in specific factual contexts.

Defendants argue that Plaintiff's current position, i.e., arguing that Defendants discriminated against her based on race, ethnicity, disability, source of income and familial status in pursuing eviction proceedings, is inconsistent with the position she took before the Housing Court to obtain the May 11, 2006 Stipulated Agreement. The Stipulated Agreement provides for a stay of execution through June 30, 2007. Plaintiff was canvassed on this agreement by the Housing Court and stated that she understood the agreement, accepted its terms, and agreed that it was fair. (*Sutton II* Trans. 88:3-19.) Plaintiff also requested, however, that the Court add a provision ordering James Sutton not to go near her son. (Id. at 88:20-26.)[12]

Contrary to what Defendants argue, Plaintiff did not agree that her eviction was fair, but only that the parties' settlement agreement was fair. The agreement, as far as this Court is aware, did not speak to the issue of discrimination. Therefore, the position Plaintiff took at the conclusion of *Sutton II* does not estop Plaintiff from arguing here that Defendants discriminated against her during her tenancy. See Simon v. Safelite Glass Corp., 128 F.3d 68, 72-73 (2d Cir. 1997) ("There must be a true inconsistency between the statements in the two proceedings. If the statements can be reconciled there is no occasion to apply an estoppel."). Moreover, it has not been shown that the Housing Court adopted Plaintiff's earlier position. See Mulvaney

---

[12] The Court rejected this request. (See *Sutton II* Trans. 88-92.)

Mechanical, Inc. v. Sheet Metal Workers, 288 F.3d 491, 504-05 (2d Cir. 2002) ("Judicial estoppel is inappropriate without a showing that the prior tribunal adopted the original representations."). Although the Housing Court approved the Stipulated Agreement, it made no findings with regard to the merits of either party's arguments. Accordingly, it cannot be said that Defendants have proved judicial estoppel such that this Court should find that Plaintiff is estopped from arguing that Defendants discriminated against her in violation of the FHA.

### 2. Collateral Estoppel

Defendants also argue that state law principles of collateral estoppel bar Plaintiff from relitigating the issue of Defendants' motives in bringing the eviction proceedings. Under the doctrine of collateral estoppel, or issue preclusion, parties or their privies are prevented from "relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 288 (2d Cir. 2002); see also Cumberland Farms, Inc. v. Groton, 262 Conn. 45, 58 n.17, 808 A.2d 1107 (2002) (holding that the doctrine of collateral estoppel "precludes a party from relitigating issues and facts actually and necessarily determined in an earlier proceeding between the same parties or those in privity with them upon a different claim") (citation omitted). Collateral estoppel applies, and an issue cannot be relitigated, when: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." Marvel Characters, 310 F.3d at 288-89 (quoting Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)); accord Delahunty v. Mass. Mut. Life Ins. Co., 236 Conn. 582, 600, 674 A.2d 1290 (1996). The Connecticut Supreme Court has

elaborated on this test, explaining:

> 'An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined. . . . An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered. If an issue has been determined, but the judgment is not dependent upon the determination of the issue, the parties may relitigate the issue in a subsequent action. Findings on nonessential issues usually have the characteristics of dicta.' . . . To assert successfully the doctrine of issue preclusion, therefore, a party must establish that the issue sought to be foreclosed actually was litigated and determined in the prior action between the parties or their privies, and that the determination was essential to the decision in the prior case.

Delahunty, 236 Conn. at 600-01 (quoting Jackson v. R.G. Whipple, Inc., 225 Conn. 705, 714-15, 627 A.2d 374 (1993)) (internal citations omitted).

> In *Sutton I*, Plaintiff's Second and Third Special Defenses stated:

> On or about July 30, 2004 and several occasions prior thereto, [defendant Stanford Sutton] and/or his agent or attorney discriminated against the defendant in the terms, conditions or privileges of rental of a dwelling or in the provision of services in connection therewith by reason of the defendant's national origin, ancestry, source of income and/or familial status.

(Am. Ans. & Special Defense, Second Special Defense ¶ 1, Third Special Defense ¶ 1, Ex. F to James Sutton Decl.) After hearing testimony regarding this allegation and Plaintiff's claim that Defendants retaliated against her for complaining to local agencies, the Housing Court stated:

> I've got a real problem. I don't think [Plaintiff is] acting in good faith . . . . I've heard her testimony. I don't think she's acted in good faith whatsoever with respect to the complaints. She didn't find a new place to move to. She remains in there. I've heard no evidence that in fact, the place was as bad as she said it was . . . . the only valid hinge that you have is with respect to the equitable defenses.

(*Sutton I* Trans. 6:20-7:3.) The Housing Court later ruled from the bench, finding:

> I think that there's no good faith exhibited by [Plaintiff] with respect to the complaints that she made. . . . There's been no evidence satisfactory to the Court. I think her testimony is so exaggerated and so incredulous to the Court that I can't give much of her testimony any credit at all.

(Id. at 10:6-18.) Despite these findings, the Housing Court found that Plaintiff was entitled to judgment based on the equities.[13] (See id. at 10:18-23.)

In this case, Plaintiff brings claims of discrimination under the FHA. Contrary to Defendants' assertions, it does not appear that "the identical issue was raised" in the Housing Court proceeding, that "the issue was actually litigated and decided" in the Housing Court proceeding, that Plaintiff had "a full and fair opportunity to litigate the issue" or that "the resolution of the issue was necessary to support a valid and final judgment on the merits." Marvel Characters, 310 F.3d at 288-89. The Housing Court found, based on the equities, that Plaintiff was entitled to judgment. Its statements with regard to Plaintiff's good faith, credibility and complaints were not necessary to the judgment, and therefore are more akin to dicta. See Delahunty, 236 Conn. at 600 ("Findings on nonessential issues usually have the characteristics of dicta."). Accordingly, *Sutton I* does not collaterally estop Plaintiff from litigating her claims in the instant action.

Defendants also argue that the issue of Defendants' discriminatory motives was "necessarily determined" by agreement of the parties and the Housing Court in connection with the parties' Stipulated Agreement and the entry of judgment in *Sutton II*. Although "[i]t is clear that a dismissal, with prejudice, arising out of a settlement agreement operates as a final judgment for res judicata purposes," Marvel Characters, 310 F.3d at 287, this Court still has to evaluate whether the other factors set forth in Marvel Characters support a finding of collateral

---

[13]     The Housing Court stated: "The problem is with respect to the equities. [Plaintiff] has a section 8. If she loses this section 8, she'll lose the apartment; she'll lose the section 8. And it's on that base alone that I'm going to issue judgment in favor of [Plaintiff] on that count alone." (*Sutton I* Trans. 10:18-23.)

estoppel.

In *Sutton II*, Plaintiff did not raise discrimination as a special defense, but instead argued that she was entitled to judgment based on equity and the doctrine of res judicata, in light of the judgment reached in *Sutton I*. After two days of evidence, the parties entered into a Stipulated Agreement providing for judgment of possession in favor of Stanford Sutton with a stay of execution until June 30, 2007. The Housing Court entered judgment in accordance with the Stipulated Agreement. Defendants argue, based on the entry of judgment, that the Housing Court judge necessarily determined that the Stipulated Agreement and anticipated eviction were lawful. This finding does not preclude Plaintiff from now arguing that Defendants' discriminated against her pursuant to the FHA or that they subjected her to intentional infliction of emotional distress. Plaintiff seeks injunctive relief requiring Defendants to cease any harassment, compensatory and punitive damages, and attorneys' fees and costs. She does not seek to disturb the agreement reached in *Sutton II*, i.e., that Stanford Sutton is entitled to possession of the apartment after June 30, 2007.[14] Accordingly, the doctrine of collateral estoppel does not apply. See Carnese v. Middleton, 27 Conn. App. 530, 535, 608 A.2d 700 (1992) ("Because this action is a claim for damages arising out of the relation of landlord and tenant that had to be and was pursued separately from the landlord's claim for possession, the doctrine of res judicata has no application.").

---

[14]    Although Plaintiff does not seek, in this action, to disturb the Stipulated Agreement, she has filed a separate state court action claiming that Defendants, her lawyer and their lawyer, among others, made misrepresentations and deceived her in order to induce her to sign the Stipulated Agreement. (See *Sutton III* Compl., Ex. D to Guy Sutton Decl.) Defendants question Plaintiff's motive in filing this state court action, however, it does complicate the issues of judicial and collateral estoppel. See Hunnicutt v. Armstrong, 305 F. Supp. 2d 175, 182 (D. Conn. 2004) (relying in part on the fact that the plaintiff "has not moved to vacate the settlement" in holding that the plaintiff's claims were barred by collateral estoppel based on a prior settlement agreement).

3.     Discrimination Claims

Plaintiff claims that Defendants discriminated against her on the basis of her race, disability and familial status, in violation of Title VIII of the Civil Rights Act of 1968, also known as the Fair Housing Act ("FHA"), as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 et seq. ("FHAA").[15]  The FHA forbids discrimination in housing on the basis of race, color, religion, sex, familial status, or national origin and, most recently, handicap. See 42 U.S.C. § 3604.

a.     Section 3604(f)

Section 3604(f) makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . that buyer or renter," or "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of . . . that person." 42 U.S.C. § 3604(f)(1)-(2).  Discrimination prohibited by the FHA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." Id. § 3604(f)(3)(B).

Ordinarily, a landlord's "duty to make reasonable accommodations is framed by the

_____

[15]     Plaintiff attempts to add, in her opposition brief, a claim that Defendants discriminated against her based on her "source of income." (See Pl.'s Mem. Opp. 8.)  In addition to the fact that this addition is untimely and improperly raised, the claim fails as a matter of law.  The FHA does not include "source of income" or Section 8 tenants in its list of protected classes. See 42 U.S.C. § 3604(b). Moreover, the Second Circuit has made clear that neither economic nor Section 8 status is a basis for a discrimination claim under the FHA. See Salute v. Stratford Greens Garden Apts., 136 F.3d 293, 301 ("Economic discrimination—such as the refusal to accept Section 8 tenants—is not cognizable as a failure to make reasonable accommodations, in violation of § 3604(f)(3)(b)."). Because the proposed amendment is futile, it is rejected.

nature of the particular handicap." <u>Salute v. Stratford Greens Garden Apts.</u>, 136 F.3d 293, 301

(2d Cir. 1998). "A defendant must incur reasonable costs and take modest, affirmative steps to

accommodate the handicapped as long as the accommodations sought do not pose an undue

hardship or a substantial burden." <u>Tsombanidis v. W. Haven Fire Dep't</u>, 352 F.3d 565, 578 (2d

Cir. 2003); <u>see also</u> <u>United States v. California Mobile Home Park Mgmt. Co.</u>, 29 F.3d 1413,

1418 (9th Cir. 1994) (whether a requested accommodation is required under the FHAA is a

"highly fact-specific, requiring case-by-case determination").

To make out a claim of disability discrimination based on her landlord's duty to

reasonably accommodate, Plaintiff must show that: (1) she suffers from a handicap as defined by

the FHA; (2) Defendants knew or reasonably should have known of Plaintiff's handicap; (3)

accommodation of the handicap "may be necessary" to afford Plaintiff an equal opportunity to

use and enjoy the dwelling; and (4) Defendants refused to make such accommodation. <u>Bentley v.

Peace & Quiet Realty 2 LLC</u>, 367 F. Supp. 2d 341 (E.D.N.Y. 2005) (citing <u>United States v.

California Mobile Home Park Mgmt. Co.</u>, 107 F.3d 1374, 1380 (9th Cir. 1997)).

Plaintiff's § 3604(f) claim fails because she has failed to establish that she is

handicapped. To be considered "handicapped" under the FHA, Plaintiff must show that: (1) she

suffers from "a physical or mental impairment which substantially limits one or more of [her]

major life activities"; (2) she has "a record of having such an impairment"; or (3) she is

"regarded as having such an impairment." 42 U.S.C. § 3602(h). In the first category, an

individual is considered disabled if he or she: (1) suffers from a physical or mental impairment

that (2) affects a major life activity, and (3) the effect is "substantial." <u>See</u> <u>Bragdon v. Abbott</u>,

524 U.S. 624, 631, 141 L. Ed. 2d 540, 118 S. Ct. 2196 (1998).

Plaintiff's Amended Complaint states only that she is "disabled." (Am. Compl. ¶¶ 5, 11.) In her deposition, Plaintiff testified that she suffers from "nerve damage" or neuropathy, which she claims causes her pain that is strongest in her legs and arms but that "jumps" around, affecting different parts of her body. (Lachira Dep. 10-12.) Plaintiff has not, however, disclosed any expert to testify concerning this medical condition, nor has she proffered any evidence to show that this condition "substantially limits" her major life activities. See Toyota Motor Mfg. v. Williams, 534 U.S. 184, 198, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002) ("It is insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment."). Plaintiff's opposition brief discusses her allegations with regard to Defendants' behavior, but does not discuss her alleged disability. On the record before the Court, there is no evidence showing that Plaintiff suffers from a handicap as defined by the FHA. Accordingly, her disability discrimination claim, pursuant to § 3604(f), fails.

> *b.* *Section 3617*

Plaintiff alleges that James Sutton made insulting statements to her and her son, refused to make requested repairs, and had a "scheme" to move her into a different building. Defendants do not dispute, for purposes of this motion, that the landlord, Stanford Sutton, can be held vicariously liable for James Sutton's conduct under agency principles. See Cabrera v. Jakabovitz, 24 F.3d 372, 385 (2d Cir. 1994).

Plaintiff's claim arises under 42 U.S.C. § 3617, which makes it unlawful to

coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [42 U.S.C. §§ 3603, 3604, 3605, or 3606].

42 U.S.C. § 3617. Section 3617 may be read as making any violation dependent on an underlying substantive violation of §§ 3603 through 3606, however, courts within this circuit have held that § 3617 can, at times, serve as a separate basis for an FHA claim even where there is no predicate for liability under any of the statute's specifically referenced enumerated substantive provisions. See Ohana v. 180 Prospect Place Realty Corp., 996 F. Supp. 238, 240-43 (E.D.N.Y. 1998); Marks v. BLDG Mgmt. Co., No. 99 Civ. 5733 (THK), 2002 U.S. Dist. LEXIS 7506, *32-33 (S.D.N.Y. Apr. 26, 2002); see also Taal v. Zwirner, No. 02-131-M, 2004 U.S. Dist. LEXIS 4546, *22 (D.N.H. Mar. 22, 2004) ("Although there is some disagreement among courts that have considered the point, this court will assume that the provisions of 42 U.S.C. § 3617 provide a separate and substantive basis upon which to base liability under the FHA.").[16]

In two recent cases, the Seventh Circuit found that § 3617 provides a cause of action only for plaintiffs who complain about discrimination in acquiring, rather than simply enjoying, property. See East-Miller v. Lake County Highway Dep't, 421 F.3d 558, 562 (7th Cir. 2005); Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n, 388 F.3d 327, 329-30 (7th Cir. 2004). In both cases, however, the Seventh Circuit held, based on 24 C.F.R. § 100.400(c)(2)—a

---

[16] The Second Circuit found, in Frazier v. Rominger, that "Section 3617 prohibits the interference with the exercise of Fair Housing rights only as enumerated in [§§ 3603, 3604, 3605 or 3606], which define the substantive violations of the Act." 27 F.3d 828, 834 (2d Cir. 1994). At issue in Frazier was the discrete question of whether a landlord's refusal to rent, which would clearly be cognizable under § 3604(a), could serve, simultaneously, as a separate § 3617 claim because it would also constitute "interference" under § 3617. As the Second Circuit pointed out, "under this theory, every allegedly discriminatory denial of housing under § 3604(a) would also constitute a violation of § 3617 in that the denial 'interfered' with the prospective tenant's Fair Housing Act rights." Id. Consequently, the Court "declined to believe that Congress ever intended such a statutory overlap" and concluded "that the plaintiffs' sole remedy in this case existed in their § 3604(a) cause of action." Id. As the Ohana court found, a "careful reading" of Frazier suggests that the Second Circuit may agree that, in certain circumstances, § 3617 can serve as a separate basis for an FHA claim even where there is no predicate for liability under §§ 3603 through 3606. 996 F. Supp. at 241.

regulation issued by HUD—that § 3617 could be violated even if §§ 3603 through 3606 are not implicated. See East-Miller, 421 F.3d at 562; Halprin, 388 F.3d at 330. The East-Miller and Halprin courts both questioned the validity of 24 C.F.R. § 100.400(c)(2), but declined to rule on its validity because the parties in both cases failed to raise the issue. The HUD regulation, which interprets § 3617, provides:

> Conduct made unlawful under [§ 3617] includes . . . Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons.

24 C.F.R § 100.400(c)(2). Like the Ohana court, this Court finds that the reach of § 3617 is not "free from doubt," and therefore, 24 C.F.R. § 100.400(c)(2), which provides a "plausible construction of the statute and is compatible with Congress' expressed broad purpose in enacting the FHA," is entitled to deference. 996 F. Supp. at 242 (citing, among others, Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984)).[17]

Following the general trend in this circuit as well as 24 C.F.R. § 100.400(c)(2), this Court finds that Plaintiff can assert a stand-alone § 3617 claim, seeking recovery not only for conduct interfering with efforts to acquire property, but also for post-acquisition interference.

In order to prevail on her § 3617 claim, Plaintiff must show that: (1) she is a member of a protected class under the FHA, (2) she was engaged in the exercise or enjoyment of her fair housing rights, (3) Defendants were motivated in part by an intent to discriminate, and (4)

---

[17] Aside from Defendants' cursory statement that "[t]he HUD regulation is invalid because it strays from what is expressly covered by section 3617 . . . and impermissibly expands the scope of section 3617," the parties here do not attack the validity of the HUD regulation.

Defendants coerced, threatened, intimidated or interfered with Plaintiff on account of her protected activity under the FHA. East-Miller, 421 F.3d at 563.[18]  It is undisputed that Plaintiff, as a single, Hispanic woman, is a member of a protected class with regard to both race and familial status.  Defendants argue that Plaintiff cannot establish the third and fourth elements of her prima facie case, i.e., that Defendants were motivated in part by an intent to discriminate, and that they coerced, threatened or interfered with Plaintiff on account of activity protected by the FHA.

Plaintiff may prove the third element, intentional discrimination, either directly, through direct or circumstantial evidence, or indirectly, through the burden-shifting framework established in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-03, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). See East-Miller, 421 F.3d at 563; Campbell v. Robb, 162 Fed. Appx. 460, 473-474 (6th Cir. 2006); see also Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 53-54 (2d Cir. 2002) (applying the McDonnell-Douglas test to a claim of retaliation under § 3617).  Under the McDonnell-Douglas test, Plaintiff must first establish a prima facie case of discrimination.  In response, Defendants must offer a legitimate nondiscriminatory reason for its conduct.  Finally, Plaintiff must show that Defendants' proffered reason is pretext for unlawful discrimination.

Plaintiff alleges that Defendants told her "it has been a mistake to rent to you with a child," that James Sutton screamed, cursed and insulted her and her son by saying, *inter alia*, "move you stupid Spanish people," that they entered her apartment without notice, refused to

---

18      Because Plaintiff does not argue otherwise, the Court will assume, as the East-Miller court held, that "a showing of intentional discrimination is an essential element of a § 3617 claim." 421 F.3d at 563.

perform repairs, refused to sign her HUD application, locked her out of the basement, refused to

provide her with an adequate supply of water and retaliated against her for filing a complaint

with the CHRO by kicking the plants outside of her home.  Plaintiff also sets forth allegations

that James Sutton injured her "hand, arm and body" her while attempting to enter her apartment

to do repairs in December 2005.  Defendants argue that Plaintiff was a difficult, argumentative

tenant, and indeed, many of the above complaints have been found, by the state Housing Court,

the CHRO, and the police who responded to a complaint, to be without merit.  The admissible

evidence submitted in support of these allegations consists primarily of Plaintiff's affidavit and

her depositions; she offers no corroboration for her claims.  The credibility of Plaintiff's

allegations is thrown into question by the facts that (1) she was a tenant for more than four years,

but did not formally complain about Defendants' conduct until after they filed the first eviction

case, and (2) she is seeking to continue living in Defendants' building.  Moreover, the record

shows that Stanford Sutton had other Hispanic tenants during Plaintiff's tenancy, including

another single Hispanic woman receiving Section 8 assistance.  There is no evidence that

Defendants initiated eviction proceedings against these tenants or had any problems whatsoever

with any of these tenants.

The FHA was not intended "to convert every quarrel among neighbors in which a racial

or religious slur is hurled into a federal case." Halprin, 388 F.3d at 330.  A "pattern of

harassment" which is "invidiously motivated," however, may be actionable under § 3617. Id.; see

also Ohana, 996 F. Supp. 238 (finding that the plaintiffs had set forth a cognizable § 3617 claim

with allegations that defendants engaged in a pattern of harassment and discriminatory acts

which included racial and anti-Jewish slurs and epithets, threats of bodily harm, and noise

disturbances).  Most of the cases finding a violation of § 3617 involve allegations of force and violence, such as the firebombing of a home or car, physical assaults, vandalism, firing weapons, or other extreme activities designed to drive a person out of his or her home. See Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n, 208 F. Supp. 2d 896, 903-904 (N.D. Ill. 2002) ("Courts have applied § 3617 to threatening, intimidating, or extremely violent discriminatory conduct designed to drive an individual out of his home. These cases involve extreme and overt acts, such as cross-burning, firebombing homes or cars, shooting shotguns, physical assaults, or throwing Molotov cocktails.") (collecting cases); see also Whisby-Myers v. Kiekenapp, 293 F. Supp. 2d 845 (N.D. Ill. 2003) (denying motion to dismiss § 3617 claim because the "alleged detonation of an explosive device simulator to intimidate the husband and wife was the kind of threatening and intimidating conduct designed to drive them out of their home"); Byrd v. Brandeburg, 922 F. Supp. 60, 64-65 (N.D. Ohio 1996) (finding in plaintiffs' favor where plaintiffs' produced evidence of racially motivated violence, including a Molotov cocktail thrown onto the plaintiffs' porch); Johnson v. Smith, 810 F. Supp. 235 (N.D. Ill. 1992) (cross-burning in the yard outside of the plaintiffs' residence and the related breaking of one of the windows in their home actionable under § 3617); Stirgus v. Benoit, 720 F. Supp. 119 (N.D. Ill. 1989) (racially motivated firebombing of plaintiff's home actionable); Seaphus v. Lilly, 691 F. Supp. 127, 139 (N.D. Ill. 1988) (finding "various acts of violence and property damage," including alleged physical assaults and attempted arson, designed "to induce plaintiffs to leave their homes because of their race" actionable under § 3617); Stackhouse v. De Sitter, 620 F. Supp. 208, 211 (N.D. Ill. 1985) (firebombing of plaintiff's car).

In extreme instances, however, lesser conduct which serves to "coerce, intimidate,

threaten, or interfere" may also be actionable.  See, e.g., Ohana, 996 F. Supp. at 241-42.  In recognition of the First Amendment rights involved, courts have found that "[s]peech can amount to a violation of § 3617 only when it is 'directed to inciting or producing imminent violence and is likely in fact to do so.'"  Taal, 2004 U.S. Dist. LEXIS 4546 at *22-23 (quoting White v. Lee, 227 F.3d 1214, 1230 (9th Cir. 2000)).  Because "[t]hreats of violence, coercion, and intimidation directed against individuals . . . do not qualify as advocacy," they "may well constitute a violation of § 3617."  Id. at *23.

The evidence presented here is insufficient to show intentional discrimination.  The quarrels and fights described by the parties, while certainly undesirable, do not evince a discriminatory intent on the part of Defendants.  Aside from allegedly calling Plaintiff a "stupid Spanish person," there is no evidence that any of James' Sutton's conduct, even if wrongful, was motivated by any discriminatory animus.

Even if Plaintiff had adequately shown a genuine issue of material fact regarding intentional race or familial status discrimination, she would have also had to show that "the conduct alleged in the complaint amounts to 'threatening, intimidating or interfering' within the meaning of the statute and the regulation."  Halprin, 388 F.3d at 330.  In Taal, the plaintiffs alleged "disturbing and unacceptable racial bigotry in broad and general terms" and claimed "'hundreds' of incidents demonstrating racial animosity." 2004 U.S. Dist. LEXIS 4546 at *7, 15.  The Court held that the plaintiffs failed to prove a separate § 3617 claim, finding that they "produced almost nothing by way of evidence, or even descriptions of specific events, from which a reasonable jury could find for them on any asserted federal claim."  Id. at *8.  On the record presented, the Court held that the plaintiffs failed to make the showing necessary for their

claim:

> While there can be little doubt that the [plaintiffs] and the [defendants] did not get along, and that on at least one occasion defendant's husband . . . resorted to racial epithets and lewd gestures, that is not enough to establish an FHA claim under § 3617. Congress did not intend the FHA to provide a remedy for every squabble, even continuing squabbles, between neighbors of different races. Broad-form claims aside, nothing plaintiffs have presented suggests the type of conduct intended to be covered by § 3617.

Id. at *27; see also Egan v. Schmock, 93 F. Supp. 2d 1090, 1093 (N.D. Cal. 2000) (the FHA was not intended to "cover any discriminatory conduct which interferes with an individual's enjoyment of his or her home," but only that "which is designed to drive the individual out of his or her home").

As in Taal, the evidence presented in this case does not reveal conduct egregious or severe enough to give rise to a § 3617 claim. The conduct alleged and shown in this case seems more akin to a "quarrel" between a tenant and her landlord than the "pattern of harassment" found to be actionable in Halprin and Ohana. Notwithstanding the broad language used in some of Plaintiff's allegations, nothing presented here establishes the type of conduct intended to be covered by § 3617. For these reasons, the Court finds that Defendants are entitled to judgment on Plaintiff's § 3617 claim.

### 4.     Intentional Infliction of Emotional Distress

Finally, Plaintiff sets forth a claim for intentional infliction of emotional distress under Connecticut law. The allegations that form the basis of this claim are the same as those alleged in support of Plaintiff's FHA claim. To prevail on this claim, Plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was

extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Appleton v. Board of Educ., 254 Conn. 205, 210, 757 A.2d 1059 (2000) (quoting Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986)); see also DeLaurentis v. New Haven, 220 Conn. 225, 597 A.2d 807 (1991) ("it is the intent to cause injury that is the gravamen of the tort").

### a.     Extreme and Outrageous

Defendants argue that the evidence submitted by Plaintiff does not support a finding that their conduct was "extreme and outrageous."  The question of whether conduct is "reasonably regarded" as extreme and outrageous is initially a question for the court; an intentional infliction of emotional distress claim should be submitted to a jury only when the court finds that "reasonable minds may differ" on this question. Reed v. Signode Corp., 652 F. Supp. 129, 137 (D. Conn. 1986).  Connecticut state and federal courts have interpreted the extreme and outrageous qualification strictly. See Golnik v. Amato, 299 F. Supp. 2d 8, 15-17 (D. Conn. 2003) (citing cases).

An intentional infliction of emotional distress claim requires conduct that exceeds "all bounds usually tolerated by decent society . . . ." Petyan, 200 Conn. 254 n.5, quoting W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 12, p. 60.  As discussed in the Restatement:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an

> average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46 cmt. d (1965). A defendant's conduct that is "merely insulting or displays bad manners or results in hurt feelings" is insufficient to form the basis of an intentional infliction of emotional distress claim. Appleton, 254 Conn. at 211 (quoting Mellaly v. Eastman Kodak Co., 42 Conn. Supp. 17, 19, 597 A.2d 846 (1991)).

Connecticut cases involving similar—and even more severe—allegations have generally held that the conduct alleged was not extreme and outrageous. In Burr v. Howell, No. CV020464225S, 2003 Conn. Super. LEXIS 1857, 2003 WL 21675848 (Conn. Super. Ct. June 25, 2003), a Connecticut court found that the alleged use of the racial epithet "nigger" was not sufficiently "extreme and outrageous" to state a claim for intentional infliction of emotional distress. Id. at *13-14. In Engle v. Bosco, No. CV054006996S, 2006 Conn. Super. LEXIS 2792, 2006 WL 2773603 (Conn. Super. Ct. Sept. 14, 2006), the plaintiff alleged that throughout his eight-year term of employment, the president of the company repeatedly "verbally belittled and abused" him and other employees. Id. at *1. Specifically, the president allegedly referred to the plaintiff and his co-workers as "dumb mother fuckers," accused them of being "brain dead" in the presence of other employees, insulted plaintiff with numerous other lewd and offensive comments, spit on plaintiff and threatened to terminate his employment. See id. at *2-3. The court held that these allegations, viewed in the light most favorable to the plaintiff, were not "extreme and outrageous," and therefore were insufficient to state a claim for intentional infliction of emotional distress. Id. at *6-7. In Leone v. New Eng. Communs., No. CV010509752S, 2002 Conn. Super. LEXIS 1361, 2002 WL 1008470 (Conn. Super. Ct. Apr. 10,

2002), where the court denied the motion to strike the plaintiff's intentional infliction of emotional distress claim, the allegations were far more severe and specific. Specifically, the plaintiff alleged that his employers "referred to the plaintiff as 'dago, wop, Father Sarducci or Gimabroni,' . . . placed sexually offensive comments and pictures on his computer, . . . made comments about his penis, his sexual performance, homosexuality and the like. Such comments were also made to him about others who were employed by his company, those with whom the company had contact or who were customers of the defendant." Id. at *8.

The cases cited by Plaintiff are distinguishable. The majority of the cases cited involved a motion to strike or to dismiss, where courts apply a much lower standard of review than that at the summary judgment stage, determining only whether a plaintiff's allegations stated a claim for intentional infliction of emotional distress.[19] See, e.g., Leone, 2002 Conn. Super. LEXIS 1361, 2002 WL 1008470; Whelan v. Whelan, 41 Conn. Supp. 519, 588 A.2d 251 (1991); Mellaly v. Eastman Kodak Co., 42 Conn. Supp. 17, 597 A.2d 846 (1991); Centi v. Lexington Health Care Ctr., No. CV 960383535, 1997 Conn. Super. LEXIS 1202 (Conn. Super. Ct. May 1, 1997). Indeed, as one of the courts noted, a "more appropriate manner of testing whether the conduct and emotional distress reached the threshold" required for an intentional infliction of emotional distress claim would be by a motion for summary judgment, where the court "is able to consider the *actual* facts rather than those that could be proved under the allegations of the complaint construed in a manner most favorable to the plaintiff." Mellaly, 42 Conn. Supp. at 19 n.3

---

[19] Although it did not involve a motion to strike or to dismiss, the procedural posture was again different in Berry v. Loiseau, 223 Conn. 786, 614 A.2d 414 (1992), with the Connecticut Supreme Court reviewing for abuse of discretion the trial court's refusal to set aside a jury's finding of intentional infliction of emotional distress. Moreover, the evidence presented—i.e., that the plaintiff was subjected to physical abuse and false imprisonment—indicated much more extreme and outrageous conduct than that presented here. See id.

(emphasis added).  The allegations here, although possibly sufficient to state a claim, do not appear to be "extreme and outrageous" in light of the evidence actually presented to the Court.

The other cases cited by Plaintiff, although numerous, do not change this Court's conclusion.  First, the facts involved in those cases are very different from those presented here and thus are difficult to analogize to this case.  Moreover, the failure here is not with Plaintiff's allegations, but with the evidence presented.  The admissible evidence on record does not indicate that Defendants' conduct was extreme and outrageous, but only that the parties' landlord-tenant relationship has deteriorated to a point where it is routinely contentious.

The comments allegedly made here—i.e., Plaintiff's allegation that James Sutton said "move you stupid Spanish people," and her vague allegation that he screamed, cursed and insulted her and her son—do not appear to rise to the level of conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d (1965).  There is no evidence to support Plaintiff's allegations that Defendants refused to perform repairs, refused to comply with HUD regulations, or otherwise engaged in conduct that threatened her Section 8 status.  In light of Defendants' evidence, Plaintiff's claims regarding being locked out of the basement, deprived of water, Defendants' "scheme" to move her into another building, and her description of the December 19, 2005 incident appear to have no merit.  Although "[t]here is no bright line rule to determine what constitutes extreme and outrageous conduct sufficient to maintain an action," courts must distinguish between "the slight hurts which are the price of a complex society and the severe mental disturbances inflicted by intentional acts wholly lacking in social utility." Burr v. Howell, 2003 Conn. Super. LEXIS 1857

at *8-9. This case seems to fall into the former category. If in fact Defendants did engage in the conduct described herein, it appears to have been isolated in the context of a heated breakdown of the parties' landlord-tenant relationship, rather than a pattern of racially-motivated conduct. See id. at *12. This Court certainly does not condone the behavior described by Plaintiff, however, it does not appear to be so extreme or outrageous to meet the standard of unacceptability required for the tort of intentional infliction of emotional distress.

b.      *Severe Emotional Distress*

Because the Court has found that the alleged conduct was not extreme and outrageous, it is unnecessary to determine whether Plaintiff suffered severe emotional distress, although the Court notes that no evidence was provided to support such a finding. With regard to this prong, Plaintiff states only that she "suffered enormous distress at the hands of the defendants. The plaintiff is able to testify to the emotional distress experienced as medical records are not required to prove emotional distress in the state of Connecticut." (Pl.'s Mem. Opp. 22.) Although it is unclear in Connecticut whether a plaintiff must seek medical treatment in order to maintain a claim of intentional infliction distress under Connecticut law, see Almonte v. Coca-Cola Bottling Co., 959 F. Supp. 569, 575 (D. Conn. 1997) (citing Rosenberg v. Hebrew Home and Hosp., No. CV 33 31 35, 1997 Conn. Super. LEXIS 168, 1997 WL 35808, *2 (Conn. Super. Ct. Jan. 23, 1997) and Reed v. Signode Corp., 652 F. Supp. 129, 137 (D.Conn. 1986)), Plaintiff has not shown that any emotional distress suffered was "severe," at a level which "no reasonable person could be expected to endure," or that she experienced her symptoms "to an extraordinary degree." See Almonte, 959 F. Supp. at 575 (granting summary judgment on the plaintiff's claim of intentional infliction of emotional distress on the ground that plaintiff failed

42

to set forth any evidence indicating that he suffered his symptoms—i.e., sleeplessness, depression and anxiety—"to an extraordinary degree"); Reed, 652 F. Supp. at 137 (granting summary judgment on the plaintiff's claim of intentional infliction of emotional distress and noting that "plaintiff was neither treated nor did he seek medical assistance for the distress he allegedly suffered"). Accordingly, Plaintiff's intentional infliction of emotional distress claim fails on this basis as well.

Because Plaintiff has not shown that Defendants' conduct was extreme and outrageous or that she suffered severe emotional distress, Defendants are entitled to judgment on Plaintiff's claim of intentional infliction of emotional distress.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 32] is **granted** and their Motion to Strike [Doc. No. 48] is **granted in part** and **denied in part**. The clerk may close the case.

SO ORDERED.

Dated at New Haven, Connecticut, May  7 , 2007.

_____/s/_____
Peter C. Dorsey, U.S. District Judge
United States District Court